# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

MARY F. HOLMES,                    )
                                   )
      Plaintiff,                   )
                                   )
    vs.                            )      **Case No. 4:06CV00861 ERW**
                                   )
MICHAEL J. ASTRUE,[1]              )
Commissioner of Social Security,   )
                                   )
      Defendant.                   )

## MEMORANDUM

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision denying the application of Mary F. Holmes for a Period of Disability and Disability Insurance Benefits under Title II of the Social Security Act, and Supplemental Security Income under Title XVI of the Act. Plaintiff has filed a Brief in Support of Plaintiff's Complaint. (Document Number 13). Defendant has filed a Brief in Support of the Answer. (Doc. No. 14).

## Procedural History

On July 18, 2005, plaintiff filed her application for benefits, claiming that she became unable to work due to her disabling condition on January 18, 2005. (Tr. 42-46). This claim was denied initially, and following an administrative hearing, plaintiff's claim was denied in a written opinion by an Administrative Law Judge (ALJ), dated March 30, 2006. (Tr. 18-24, 9-17).

---

[1]This case was originally filed against Jo Anne B. Barnhart, who was at that time Commissioner of the Social Security Administration. On February 12, 2007, Michael J. Astrue became the Commissioner of the SSA, and he hereby is substituted as the defendant in this action. See Fed.R.Civ.P. 25(d)(1).

Plaintiff then filed a request for review of the ALJ's decision with the Appeals Council of the Social Security Administration (SSA), which was denied on April 28, 2006. (Tr. 8, 4-7). Thus, the decision of the ALJ stands as the final decision of the Commissioner. See 20 C.F.R. §§ 404.981, 416.1481.

## Evidence Before the ALJ

### A. ALJ Hearing

Plaintiff's administrative hearing was held on February 7, 2006. (Tr. 219). Plaintiff was present and was represented by counsel. (Id.). Plaintiff's husband, Ryan Holmes, was also present. (Id.). The ALJ admitted a number of exhibits into the record. (Id.).

The ALJ then examined plaintiff, who testified that she was 42 years of age, five feet, seven inches tall, and weighed about 260 pounds. (Tr. 220-21). Plaintiff stated that she had gained about forty pounds due to illness. (Tr. 221). Plaintiff testified that she is married and has two children, aged eleven and fourteen. (Id.). Plaintiff stated that her husband is employed. (Id.). Plaintiff testified that she lives with her husband and two children. (Id.).

Plaintiff stated that she did not have any problems driving prior to her surgery. (Tr. 22). Plaintiff testified that she underwent spinal fusion surgery on January 23, 2006, and had not yet been released to drive at the time of the hearing. (Id.).

Plaintiff testified that she completed the twelfth grade and obtained a license in cosmetology. (Id.). Plaintiff stated that she last worked on January 18, 2005. (Tr. 223). Plaintiff testified that she performed "domestic work" at her last full-time position. (Id.). Plaintiff stated that the heaviest object she was required to lift at this position weighed about twenty pounds. (Id.). Plaintiff testified that she worked at this position for about nine years. (Id.).

Plaintiff stated that she worked at Comforce Technical Services as a receptionist prior to her position as a domestic worker. (Id.). Plaintiff testified that she was required to lift less than twenty pounds at the receptionist position. (Id.). Plaintiff stated that this position required both sitting and standing. (Tr. 224). Plaintiff testified that she also made deliveries at this position. (Id.). Plaintiff stated that she worked at this job for about a year. (Id.).

Plaintiff testified that prior to working as a receptionist, she worked for the United States Postal Service as a clerk. (Id.). Plaintiff stated that she worked sixty hours a week at this position (Id.). Plaintiff testified that she was required to lift mail sacks that weighed seventy to eighty pounds. (Id.). Plaintiff stated that she worked for the Postal Service for about a year-and-a-half. (Id.).

Plaintiff testified that before she worked at the Postal Service she worked as a hairdresser. (Id.). Plaintiff stated that she worked as a hairdresser for about three years. (Id.). Plaintiff testified that she was required to lift about twenty pounds as a hairdresser. (Tr. 225). Plaintiff stated that she did not have hiring and firing authority at this position. (Id.).

Plaintiff testified that she also worked as a behavioral coach for adult patients with autism. (Id.). Plaintiff stated that she worked part-time, about thirty hours a week, at this position. (Id.). Plaintiff testified that she was required to lift patients. (Id.). Plaintiff stated that she worked at this position for about six months. (Id.).

Plaintiff testified that she stopped working because the elderly woman for whom she worked eliminated her position. (Tr. 226). Plaintiff stated that her health was bad when she was working at this position, so she decided to stop working at that time. (Id.).

Plaintiff testified that her primary doctor is Victoria Cornelius and that she has been

treating with Dr. Cornelius for several years. (Id.). Plaintiff stated that her back problem prevents her from working. (Id.). Plaintiff testified that Dr. Dirk Alander performed her back surgery. (Id.). Plaintiff stated that Dr. Alander has not released her to drive. (Id.). Plaintiff testified that Dr. Alander told her not to lift more than five pounds, or do any bending or reaching following her surgery on January 23, 2006. (Id.). Plaintiff stated that Dr. Alander also restricted her lifting prior to surgery. (Tr. 227).

Plaintiff testified that she is unable to work because she experiences lower back pain, numbness down her right leg and right foot, severe heel pain, and she has no feeling in her right arm or hand. (Id.). Plaintiff stated that her right arm and hand have worsened since she underwent surgery. (Id.).

Plaintiff testified that she takes all of her medications as prescribed. (Id.). Plaintiff stated that her medications help, although she still has pain. (Id.). Plaintiff testified that she experiences side effects from her medications, including constipation, dryness of the mouth, slight headaches, and drowsiness. (Id.).

Plaintiff stated that since she underwent surgery, on a typical day she wakes up at about 6:30 a.m., takes her medication, performs her prescribed exercises, and eats breakfast that her husband prepares. (Tr. 228). Plaintiff testified that she tries to walk around, but spends most of the day sleeping. (Id.).

Plaintiff stated that prior to undergoing surgery, she would get up in the morning, bathe, dress, eat, and try to perform as many chores as possible. (Id.). Plaintiff testified that she did not use a walker, cane, or crutches prior to undergoing surgery. (Id.). Plaintiff stated that she was able to cook and shop for groceries prior to her surgery, although she required assistance carrying

the groceries to her car.  (Id.).

Plaintiff testified that she has no source of household income other than her husband's earnings.  (Tr. 229).

Plaintiff's attorney next examined plaintiff, who testified that she would probably not be working for the elderly woman as a domestic worker had she not been laid off.  (Id.).  Plaintiff stated that the elderly woman knew about plaintiff's health, so she would not have allowed her to continue working.  (Id.).  Plaintiff explained that she and her employer had a close relationship and that her employer accommodated her.  (Id.).  Plaintiff testified that her employer would not allow her to perform any strenuous activities that would aggravate her back, such as cleaning windows or climbing ladders.  (Id.).  Plaintiff stated that her employer would ask other employees to perform these tasks.  (Id.).

Plaintiff testified that immediately prior to her alleged onset of disability, her job duties for the elderly woman included shopping for groceries, managing other household employees, helping her employer dress, and providing companionship for her employer.  (Tr. 230).  Plaintiff stated that her employer treated her differently than her other employees.  (Id.).  Plaintiff testified that she stopped performing her job duties that required heavy exertion a year prior to her alleged onset of disability due to her health problems.  (Id.).  Plaintiff stated that she missed a lot of work because she was unable to be on her feet.  (Tr. 231).  Plaintiff testified that when she worked Monday through Friday, she had to lie in bed all of Saturday and Sunday to recover.  (Id.).  Plaintiff stated that her employer did not expect much from her other than companionship.  (Id.).  Plaintiff testified that she stopped preparing meals for her employer and purchased prepared meals at the grocery store.  (Id.).

Plaintiff stated that she used to have hobbies, such as riding bicycles with her children, which she has been unable to do since January 18, 2005. (Id.).

Plaintiff testified that she is able to sit for a couple of hours before she experiences discomfort and must move around. (Tr. 232). Plaintiff stated that she is more comfortable standing. (Id.).

Plaintiff testified that she did not undergo back surgery in 2004 after an MRI revealed problems because she was afraid of surgery and had to care for her small children. (Id.).

Plaintiff's attorney noted that plaintiff was crying. (Tr. 233). Plaintiff explained that she was crying because she was tired, having gone to the doctor and walked a lot prior to the hearing. (Id.).

Plaintiff testified that during the time period of January 8, 2005, through the date of her surgery, she was able to sit a few hours with pain. (Id.). Plaintiff stated that she would have to move around while she was sitting. (Id.). Plaintiff testified that standing was more comfortable, although she still experienced pain while standing. (Id.).

The ALJ then questioned plaintiff, who testified that she has been taking Celexa[2] for a few years for depression. (Tr. 234). Plaintiff stated that the Celexa helps her depression. (Id.). Plaintiff testified that the tearfulness she experienced at the hearing has occurred frequently since her surgery. (Id.). Plaintiff stated that she did not experience much tearfulness prior to undergoing surgery. (Id.).

The ALJ then examined the vocational expert, Dr. Jeffrey Magrowski, who classified

---

[2]Celexa is indicated for the treatment of depression. See Physician's Desk Reference (PDR), 1344 (57th Ed. 2003).

plaintiff's past work as a home companion as medium, and a low level of semi-skilled.

(Tr. 235). Dr. Magrowski testified that plaintiff's past work as a receptionist was classified as light and semi-skilled. (Id.). He stated that plaintiff's past work at the post office was heavy and semi-skilled, as described by plaintiff, although it could be performed at a light level. (Id.). Dr. Magrowski testified that plaintiff's work as a behavioral coach for autistic people was medium and skilled, although it could also be performed at a light level. (Id.). He stated that plaintiff has also worked as a hairstylist, which is light and skilled, although this work may have been performed outside the fifteen-year relevant work period. (Id.). Dr. Magrowski testified that plaintiff has some office skills, skills in dealing with the public, sales skills, scheduling skills, and ordering skills, which are transferable. (Tr. 236). Dr. Magrowski stated that these skills would be transferable to sedentary jobs. (Id.).

The ALJ asked Dr. Magrowski whether an individual of the same age, education, and work experience as plaintiff, with an impairment requiring the use of a walker to ambulate would be able to engage in plaintiff's past work. (Id.). Dr. Magrowski stated that such an individual would be unable to engage in plaintiff's past work or any other competitive employment. (Id.). Dr. Magrowski testified that the individual would require a special accommodation. (Id.).

The ALJ allowed plaintiff thirty days to obtain additional medical records. (Id.).

## B.    Relevant Medical Records

Plaintiff presented to SLU Care on March 10, 2004, with complaints of depression and lower back pain. (Tr. 113-114). It was noted that an old MRI revealed L4-L5[3] degenerative disc

_____

[3]The back is comprised of the cervical, thoracic and lumbar regions. In common terms, the cervical region of the spinal column is the neck; the thoracic region is the main part of the back; and the lumbar region is the lower back. There are seven cervical vertebrae, twelve thoracic

disease.[4]  (Id.).  Plaintiff weighed 287 pounds.  (Id.).   Plaintiff reported being depressed over the

death of her mother and other stressors.  (Id.).  The assessment of the examining physician was:

lower back pain, likely muscular in origin; obesity; and depression.  (Id.).  Plaintiff was advised to

lose weight and quit smoking, and was prescribed Celexa.  (Id.).  It was noted that plaintiff did

not want medication for her depression.  (Id.).

Plaintiff presented to SLU Care on August 3, 2004, with complaints of back pain,

depression, poor sleep, and fatigue.  (Tr. 116-20).  Plaintiff reported that the Celebrex[5] was not

helping.  (Id.).  The assessment of the examining physician was: chronic back pain, combination of

stressors and psychological issues may be contributing; and fatigue.  (Id.).  A sleep study was

scheduled.  (Id.).

Plaintiff underwent a pulmonary function test on August 5, 2004, which revealed normal

pulmonary function.  (Tr. 141).

Plaintiff presented to Dirk H. Alander, M.D. on August 31, 2004, with complaints of

lower back pain and right leg pain.  (Tr. 121-23).  Upon physical examination, plaintiff had good

flexibility and limited extension.  (Id.).  Plaintiff underwent x-rays, which revealed severe vacuum

---

vertebrae, and five lumbar vertebrae.  The sacrum lies directly below the fifth lumbar vertebra.
The coccyx, or tail bone, lies below the sacrum.  See J. Stanley McQuade, Medical Information
Systems for Lawyers, § 6:27 (1993).

[4]A general term for both acute and chronic processes destroying the normal structure and
function of the intervertebral discs.  See Medical Information Systems for Lawyers, § 6:201.

[5]Celebrex is indicated for relief of osteoarthritis and for the management of acute pain.
See PDR at 2590.

phenomena[6] at the L5-S1 level with foraminal stenosis.[7]  (Id.).  The L4-5 level disc was down

about 50 percent and there was increasing angulation with forward bend.  (Id.).  Dr. Alander's

impression was moderate to severe disc degeneration at the L4-5 and L5-S1 level with foraminal

stenosis and L5 radiculitis.  (Id.).  He recommended that plaintiff undergo an MRI and start taking

Celebrex.  (Id.).  He noted that plaintiff may need to undergo surgery in the future.  (Id.).

Plaintiff presented to Dr. Alander on September 14, 2004, for a follow-up regarding her

spinal stenosis.  (Tr. 127).  Plaintiff reported that she received little relief from her medications.

(Id.).  Dr. Alander prescribed Vioxx[8] and recommended epidural steroid injections and physical

therapy.  (Id.).  Plaintiff indicated that she wanted to wait on the epidural steroid injections.  (Id.).

 Dr. Alander noted that plaintiff was young enough that she had a good chance of responding to

therapy and epidural steroid injections.  (Id.).

Plaintiff presented to SLU Care on October 11, 2004.  (Tr. 129).  It was noted that

plaintiff was still very emotional at times about many issues, but her depression had improved.

(Id.).

On October 15, 2004, plaintiff reported feeling better with the physical therapy and

Bextra.[9]  (Tr. 128).  Plaintiff indicated that she wanted to try the epidural steroid injections.  (Id.).

---

[6]The appearance of a radiolucent stripe in an intervertebral disk, a manifestation of disk degeneration.  Stedman's Medical Dictionary, 1366 (27th Ed. 2000).

[7]Narrowing in the neural foramen, the opening between the neural arches of adjacent vertebral bones which allows the spinal nerves to emerge from the spinal canal.  See Medical Information Systems for Lawyers, § 6:201.

[8]Vioxx is indicated for the relief of osteoarthritis and for the management of acute pain. See PDR at 2122.

[9]Bextra is indicated for the relief of osteoarthritis.  See PDR at 2579.

Dr. Alander's impression was moderate-to-severe disc degeneration at the L4-5 and L5-S1 level with foraminal stenosis and L5 radiculitis.[10] (Id.). Dr. Alander recommended that plaintiff undergo four epidural steroid injections[11] with Dr. Richard Gahn, and prescribed Bextra. (Id.).

Plaintiff presented to SLU Care on February 9, 2005, for a follow-up. (Tr. 130-31). Plaintiff reported that she was seeing a podiatrist, who was helping to decrease her pain. (Id.). It was noted that plaintiff's depression was "fairly stable." (Tr. 131).

On May 17, 2005, plaintiff presented to SLU Care with complaints of a dry cough and wheezing. (Tr. 133). The assessment of the examining physician was bronchitis[12] and asthma[13] exacerbation, which was improved. (Id.). On May 24, 2005, it was noted that plaintiff was feeling better and that her asthma exacerbation had resolved. (Tr. 134).

Plaintiff presented to Dr. Alander on July 19, 2005, with complaints of severe pain in the neck and shoulder that radiated into her right leg. (Tr. 180). Upon physical examination, Dr. Alander found no evidence of any rotator cuff tear. (Id.). Plaintiff had good range of motion of the right lower extremity. (Id.). Although plaintiff's straight-leg raise was negative, she had a somewhat tight hamstring. (Id.). Dr. Alander expressed the opinion that plaintiff's foraminal stenosis was "acting up again" on the right side. (Id.). He prescribed epidural steroid injections,

_____

[10]Radiculitis, or radiculopathy, is a disorder of the spinal nerve roots. See Stedman's at 1503.

[11]The delivery of steroids directly into the epidural space in the spine, which is the space between the dura mater and the vertebral wall, for pain relief. See Stedman's at 548.

[12]Inflammation of the mucous membrane of the bronchial tubes. Stedman's at 250.

[13]An inflammatory disease of the lungs characterized by reversible airway obstruction. Stedman's at 158.

anti-inflammatory Celebrex, and physical therapy.  (Id.).

Plaintiff presented to Richard S. Gahn, M.D. at Advanced Pain Control, Ltd. on August 3, 2005, upon the referral of Dr. Alander.  (Tr. 204).  Plaintiff reported low back pain, which was aggravated with prolonged sitting and activities.  (Id.).  Upon physical examination, plaintiff ambulated with a steady gait and was able to walk on both the heels and toes.  (Id.).  Dr. Gahn noted that an MRI plaintiff underwent on July 20, 2005 revealed facet joint hypertrophy[14] from L3-4 through L5-S1 and associated spinal foraminal stenosis at L4-5 and L5-S1.  (Id.).  Dr. Gahn administered an epidural steroid injection at the L4-5 interspace, which plaintiff tolerated well. (Id.).

On August 16, 2005, plaintiff presented to Dr. Alander for a review after undergoing an MRI.  (Tr. 183).  Dr. Alander stated that the MRI revealed a fairly significant central disc bulge at the L4-5 level, and significant foraminal stenosis at L5-S1 and L4-5.  (Id.).  Plaintiff reported that the epidural steroid injection helped but was not long-lasting.  (Id.).  Dr. Alander recommended that plaintiff continue with the epidural steroid injection series and consider surgery if her pain does not improve.  (Id.).

Plaintiff underwent a second epidural steroid injection on August 31, 2005.  (Tr. 205). Dr. Gahn indicated that plaintiff tolerated the procedure well.  (Id.).

Plaintiff saw Sarwath Bhattacharya, M.D. for a consultative examination at the request of the Commissioner on September 8, 2005.  (Tr. 150-53).  Plaintiff complained of low back pain and asthma.  (Tr. 150).  Plaintiff reported that she could walk five blocks, stand one hour, sit one hour, lift fifteen pounds, and bend down.  (Id.).  Upon physical examination, Dr. Bhattacharya

---

[14]Increase in the size of the face joint of the vertebrae.  See Stedman's at 857, 938.

found that plaintiff's gait was normal. (Tr. 152). Plaintiff was able to walk on her heels, toes, and almost touch her toes. (Id.). Plaintiff had some difficulty getting on and off the table. (Id.). Plaintiff's straight leg raising was "okay." (Id.). Plaintiff had good range of movement of all the upper and lower extremities. (Id.). Dr. Bhattacharya's impression was: chronic low back pain with radicular symptoms; bronchial asthma; obesity; and plantar fasciitis.[15] (Id.). With regard to plaintiff's back pain, Dr. Bhattacharya noted that there were no radicular changes except for poor deep tendon reflexes, and no muscular atrophy. (Id.).

Plaintiff saw T. Lynn Mades, Ph.D. for a psychological evaluation at the request of the Commissioner on September 8, 2005. (Tr. 145-49). Dr. Mades found plaintiff to be a "fair" informant. (Tr. 145). Plaintiff reported some depression secondary to her back pain but described it as "nothing major." (Tr. 145). Dr. Mades stated that plaintiff's depressive symptoms did not meet the criteria for major depression. (Tr. 149). Dr. Mades found no evidence that plaintiff's depression was worsening her pain condition, as in a pain disorder, and no evidence of thought disturbance. (Id.). Dr. Mades noted that there was evidence of minimal to mild mood impairment by history and presentation. (Id.). Dr. Mades diagnosed plaintiff with adjustment disorder[16] with depressed mood, with a Global Assessment of Functioning (GAF) score of 75.[17]

_____

[15]Inflammation of the plantar fascia causing foot or heel pain. Stedman's at 652.

[16]A disorder whose essential feature is a maladaptive reaction to an identifiable psychological stress, or stressors, that occurs within weeks of the onset of the stressors and persists for up to six months; the maladaptive nature of the reaction is indicated by impairment in occupational functioning, or in usual social activities or relationships with others, or with symptoms that are in excess of a normal or expectable reaction to the stressor. Stedman's at 525.

[17]A GAF score of 75 indicates that if "symptoms are present, they are transient and expectable reactions to psychosocial stressors (e.g., difficulty concentrating after family argument); no more than slight impairment in social, occupational, or school functioning (e.g.,

(Tr. 148).  Plaintiff's prognosis was described as fair to good.  (Tr. 149).

Plaintiff underwent an epidural steroid injection at the L4-5 interspace on September 15, 2005.  (Tr. 206).  Plaintiff reported that her symptoms had improved following the two epidural steroid injections.  (Id.).

Plaintiff presented to Dr. Alander on November 22, 2005.  (Tr. 186-8).  Plaintiff indicated that the epidural steroid injections worked for a while but the pain returned.  (Tr. 186).  Plaintiff reported experiencing difficulty sleeping and depression.  (Id.).  Plaintiff also reported headaches, memory loss, and blackout spells.  (Tr. 187).  Dr. Alander's impression was degenerative disc disease with L5 and S1 radiculopathy, right leg.  (Id.).  Dr. Alander expressed the opinion that plaintiff had gone through all of the conservative measures that were available and recommended surgery.  (Tr. 186).  Dr. Alander referred plaintiff to a neurologist for evaluation of her headaches, memory loss, and blackout spells, prior to surgery.  (Tr. 187).

Plaintiff underwent a lumbar discography, a diagnostic procedure, on November 29, 2005.  (Tr. 207-08).  Dr. Gahn's impression was: lumbar discography positive for producing symptoms of severe low back pain at L4-5 and L5-S1; and negative lumbar discography at L3-4.  (Tr. 208).  Plaintiff also underwent a CT scan of the lumbar spine, which revealed: a mild broad-based disc bulge at L3-4; disc disruption, disc bulging, and interspace narrowing at L4-5; and disc disruption, narrowing disc height, and neuroforaminal narrowing[18] at L5-S1.  (Tr. 210).

Plaintiff presented to Dr. Alander for a preoperative history and physical on January 17,

temporarily falling behind in schoolwork)."  Diagnostic and Statistical Manual of Mental Disorders 32 (4th Ed. 1994) ("DSM IV").

[18]Narrowing in the neural foramen, which is the opening between the neural arches of adjacent vertebral bones that allows the spinal nerves to emerge from the spinal canal.

2006. (Tr. 193-94). Dr. Alander stated that plaintiff had essentially failed conservative management, having undergone physical therapy and several epidural steroid injections. (Tr. 193). Dr. Alander's impression was lumbar degenerative disc disease, most significant at L4-5 and L5-S1, with a right L5 radiculopathy. (Tr. 193). He stated that plaintiff was scheduled to undergo minimally invasive surgical fusion[19] at L4-5 and L5-S1. (Tr. 194).

Plaintiff underwent surgical fusion on January 23, 2006. (Tr. 198). Surgical fusion of the L4-S1 was accomplished, and the vertebral bodies were in appropriate alignment. (Id.).

## The ALJ's Determination

The ALJ made the following findings:

1.    The claimant met the disability insured status requirements of the Act on January 18, 2005, and continues to meet them at least through the date of this decision.

2.    The claimant has not engaged in substantial activity since her alleged onset of disability.

3.    Under the special technique for evaluating mental impairments, 20 C.F.R. § 404.1520a (2005), the claimant has a non-severe mental impairment that does not precisely satisfy the diagnostic criteria of Part A of a listing. In addition, the claimant's mental impairment does not meet the Part B criteria. She has no more than slight limitations of activities of daily living, social functioning, and concentration, persistence, or pace. The claimant has no episodes of decompensation within one year, each lasting for at least two weeks. Her mental impairment does not meet the Part C criteria of a listing.

4.    The medical evidence establishes that the claimant has [a] severe impairment of degenerative disc disease with disc bulge at L4-5 with subsequent surgical fusion from L4 to S1.

5.    The claimant does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.

---

[19]Surgical procedure using bone grafts which permanently unite two separate bones. Medical Information Systems for Lawyers, § 6:201.

6.       For the reasons stated herein, the claimant is not fully credible.

7.       The claimant has the maximum residual functional capacity to lift and carry no more than 10 pounds frequently and 20 pounds occasionally. The claimant can sit, stand, or walk for up to six hours each in an eight-hour workday. She can no more than occasionally climb ladders, ropes, and scaffolds. She can no more than occasionally kneel and crawl. She needs to avoid concentrated exposure to occupational hazards such as open moving machinery and unprotected heights. 20 C.F.R. § 404.1545 (2005).

8.       The claimant's past relevant work as a data technician/receptionist/office assistant did not require the performance of work-related activities precluded by the above limitations.

9.       The claimant is able to perform her past relevant work as a data technician/receptionist/office assistant.

10.      The claimant has not been under a "disability," as defined in the Social Security Act, at any time through the date of this decision. 20 C.F.R. § 404.1520(e) (2005).

(Tr. 16-17).

The ALJ's final decision reads as follows:

It is the decision of the Administrative Law Judge that, based on the application filed on July 20, 2005, the claimant is not disabled for purposes of entitlement to a period of disability or disability insurance benefits under sections 216(i) and 223, respectively, of the Social Security Act.

(Tr. 17).

## Discussion

### A.    Standard of Review

Judicial review of a decision to deny Social Security benefits is limited and deferential to

the agency. See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996). The decision of the SSA

will be affirmed if substantial evidence in the record as a whole supports it.  See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000).  Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion.  See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998).  If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld.  See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992).  The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision.  See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996).  "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary."  Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998).  The analysis required has been described as a "searching inquiry." Id.

## B.      The Determination of Disability

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a).  The claimant has the burden of proving that s/he has a disabling impairment.  See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895

(8th Cir. 1998). First, it is determined whether the claimant is currently engaged in "substantial gainful employment." If the claimant is, disability benefits must be denied. See 20 C.F.R. §§ 404.1520, 416.920 (b). Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments. See 20 C.F.R §§ 404.1520 (c), 416.920 (c). To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities." Id. Age, education and work experience of a claimant are not considered in making the "severity" determination. See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment. See 20 C.F.R. §§ 404.1520 (d), 416.920 (d). This listing is found in Appendix One to 20 C.F.R. 404. 20 C.F.R. pt. 404, subpt. P, App. 1. If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired. See 20 C.F.R. §§ 404.1520 (d), 416.920 (d). If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work. See 20 C.F.R. § 404.1520 (e), 416.920 (e). If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled. See id. If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience. See 20 C.F.R. §§ 404.1520 (f), 416.920 (f). The claimant is entitled to disability benefits only if

s/he is not able to perform any other work.  See id.  Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work.  See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

The Commissioner has supplemented this five-step process for the evaluation of claimants with mental impairments.  See 20 C.F.R. §§ 404.1520a (a), 416.920a (a).  A special procedure must be followed at each level of administrative review.  See id.  Previously, a standard document entitled "Psychiatric Review Technique Form" (PRTF), which documented application of this special procedure, had to be completed at each level and a copy had to be attached to the ALJ's decision, although this is no longer required.  See 20 C.F.R. §§ 404.1520a (d), (d) (2), (e), 416.920a (d), (d) (2), (e); 65 F.R. 50746, 50758.  Application of the special procedures required is now documented in the decision of the ALJ or Appeals Council.  See 20 C.F.R. §§ 404.1520a (e), 416.920a (e).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a, 416.920a.  The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists.  See 20 C.F.R. §§ 404.1520a (b) (1), 416.920a (b) (1).  If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent." 20 C.F.R. §§ 404.1520a (b) (2), 416.920a (b) (2).  The Commissioner must then rate the degree of functional loss resulting from the impairments in four areas deemed essential to work: activities of daily living, social functioning, concentration, and persistence or pace.  See

20 C.F.R. §§ 404.1520a (b) (3), 416.920a (b) (3). Functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform work-related activities. See id. Next, the Commissioner must determine the severity of the impairment based on those ratings. See 20 C.F.R. §§ 404.1520a (c), 416.920a (c). If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder. See 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2). This is completed by comparing the presence of medical findings and the rating of functional loss against the paragraph A and B criteria of the Listing of the appropriate mental disorders. See id. If there is a severe impairment but the impairment does not meet or equal the listings, then the Commissioner must prepare a residual functional capacity assessment. See 20 C.F.R. §§ 404.1520a (c)(3), 416.920a (c)(3).

## C.    Plaintiff's Claims

Plaintiff raises four claims on appeal of the decision of the Commissioner. Plaintiff first argues that the ALJ erred in failing to consider whether plaintiff's impairments met a listing for a disorder of the spine. Plaintiff next argues that the ALJ erred in assessing the credibility of plaintiff's subjective complaints of pain and limitation. Plaintiff also argues that the ALJ erred in formulating plaintiff's residual functional capacity. Plaintiff finally argues that the ALJ failed to properly consider testimony from the vocational expert. The undersigned will discuss plaintiff's claims in turn.

## 1.    Listing

Plaintiff argues that the ALJ erred in failing to consider whether plaintiff's back impairment met Listing 1.04, the listing for a disorder of the spine. Defendant contends that the ALJ properly determined that plaintiff's impairment did not meet or equal Listing 1.04.

The burden of proof is on the plaintiff to establish that his or her impairment meets or equals a listing.  Johnson v. Barnhart, 390 F.3d 1067, 1070 (8th Cir. 2004).  To meet a listing, an impairment must meet all of the listing's specified criteria.  Id.  An impairment that manifests only some of these criteria, no matter how severely, does not qualify.  Id. (quoting Sullivan v. Zebley, 493 U.S. 521, 530-31, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990)).  Although it is preferable that ALJs address a specific listing, failure to do so is not reversible error if the record supports the overall conclusion.  Pepper ex rel. Gardner v. Barnhart, 342 F.3d 853, 855 (8th Cir. 2003).

Listing 1.04 provides as follows:

> Disorders of the Spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord.  With:
> A.  Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);
> or
> B.  Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours;
> or
> C.  Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. pt. 404, subpt. P, App. 1.

Plaintiff claims that her back impairment met the criteria for Listing 1.04A.  Plaintiff contends that the August 2005 treatment notes of Dr. Gahn and the January 2006 preoperative report prove that she meets the requirements of Listing 1.04A.

On August 3, 2005, Dr. Gahn found that plaintiff's motor sensory examination was grossly negative, she could ambulate with a steady gait, she could walk on both the heels and toes, her straight leg raising was negative bilaterally, but her deep tendon reflexes were absent. (Tr. 204). Dr. Gahn's findings reveal that plaintiff did not meet the criteria for Listing 1.04. Specifically, Dr. Gahn found that plaintiff's straight leg raising was negative and that plaintiff had no motor loss. (Id.). Dr. Gahn also did not find any limitation of range of motion.

In a January 17, 2006, pre-operative report, Dr. Alander stated that plaintiff had full motor strength in the bilateral lower extremities, intact sensation to light touch, and only a mildly positive straight raise leg raising while seated. (Tr. 193). Dr. Alander did not note any atrophy or limitation of motion, as is required by Listing 1.04A.

In sum, although the medical record supports the presence of a spinal disorder as is required by Listing 1.04, the medical evidence reveals that plaintiff's spinal disorder failed to meet the level of severity required by Listing 1.04A. Further, there is no evidence that plaintiff suffered from a spinal disorder as described by Listing 1.04A after she underwent surgery in January of 2006. Thus, the ALJ properly found that plaintiff did not have an impairment that met or equaled the requirements of a listing.

2.    **Credibility Determination**

Plaintiff argues that the ALJ erroneously found plaintiff's subjective complaints of pain and limitation not credible. Defendant contends that the ALJ's credibility determination is supported by substantial evidence on the record as a whole. "While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment,

direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced." Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (quoting settlement agreement between Department of Justice and class action plaintiffs who alleged that the Secretary of Health and Human Services unlawfully required objective medical evidence to fully corroborate subjective complaints). Although an ALJ may reject a claimant's subjective allegations of pain and limitation, in doing so the ALJ "must make an express credibility determination detailing reasons for discrediting the testimony, must set forth the inconsistencies, and must discuss the Polaski factors." Kelley, 133 F.3d at 588. Polaski requires the consideration of: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) aggravating and precipitating factors; (4) dosage, effectiveness and side effects of the medication; and (5) functional restrictions. Polaski, 739 F.2d at 1322. See also Burress, 141 F.3d at 880; 20 C.F.R. § 416.929.

The undersigned finds that the ALJ's credibility determination regarding plaintiff's subjective complaints of pain and limitations is supported by substantial evidence in the record as a whole. "[T]he question is not whether [plaintiff] suffers any pain; it is whether [plaintiff] is fully credible when she claims that [the pain] hurts so much that it prevents her from engaging in her prior work." Benskin v. Bowen, 830 F.2d 878, 883 (8th Cir. 1987). Thus, the relevant inquiry is whether or not plaintiff's complaints of pain to a degree of severity to prevent her from working are credible.

In her opinion, the ALJ specifically cited the relevant Polaski factors. (Tr. 14). The ALJ then properly pointed out Polaski factors and other inconsistencies in the record as a whole that detract from plaintiff's complaints of disabling pain. The ALJ first discussed plaintiff's daily

activities.  The ALJ noted that, although plaintiff described having problems with her daily activities, she performed household chores, drove, walked one mile a day for exercise, ironed, dusted, shopped for groceries, and did laundry.  (Id.).  Significant daily activities may be inconsistent with claims of disabling pain.  See Haley v. Massanari, 258 F.3d 742, 748 (8th Cir. 2001).  As such, the ALJ properly determined that plaintiff's ability to engage in all of these activities on a regular basis appears inconsistent with her allegation of disabling pain.

 The ALJ also noted that plaintiff's demeanor during the hearing did not lend much credibility to her as a witness.  (Tr. 14).  An ALJ may consider the claimant's appearance and demeanor at the hearing.  See Polaski, 739 F.2d at 1322.

The ALJ also discussed the fact that plaintiff has reported back pain since 1997, yet she was able to work at jobs that required lifting up to seventy pounds since that time.  (Tr. 14).  The ALJ found it significant that plaintiff was able to work this length of time despite complaints of disabling back pain.  The fact that a claimant worked successfully for a significant period of time with his or her impairments is inconsistent with a claim of disabling pain.  See Orrick v. Sullivan, 966 F.2d 368, 370 (8th Cir. 1992).

The ALJ next stated that the medical evidence does not support plaintiff's subjective complaints.  Although the ALJ may not discount subjective complaints solely because they are not fully supported by the objective medical evidence, the lack of supporting objective medical evidence may be considered as a factor in evaluating the claimant's credibility.  See Curran-Kicksey v. Barnhart, 315 F.3d 964, 968 (8th Cir. 2003).  The ALJ noted that plaintiff consistently exhibited negative straight leg raise test, a posture and gait within normal limits, and was able to walk on her heels and toes.  (Tr. 15).  The ALJ stated that the medical evidence reveals that although she

ultimately underwent surgery in January 2006, examinations and treatment prior to the surgery were not indicative of the severity of limitations she alleged.  (Id.).

An administrative opinion must establish that the ALJ considered the appropriate factors. See Holley v. Massanari, 253 F.3d 1088, 1092 (8th Cir. 2001).  However, each and every Polaski factor need not be discussed in depth, so long as the ALJ points to the relevant factors and gives good reasons for discrediting a claimant's complaints.  See Dunahoo v. Apfel, 241 F.3d 1033, 1038 (8th Cir. 2001).  In this case, the reasons given above by the ALJ for discrediting plaintiff's complaints of disabling pain are sufficient and her finding that plaintiff's complaints are not credible is supported by substantial evidence.

**3.        Residual Functional Capacity**

Plaintiff argues that the ALJ erred in formulating her residual functional capacity. Specifically, plaintiff contends that there is no medical evidence in the record to support the ALJ's determination that plaintiff is capable of performing light work.  Defendant argues that the ALJ properly formulated plaintiff's residual functional capacity.

After properly assessing plaintiff's credibility, the ALJ made the following determination regarding plaintiff's residual functional capacity:

> [t]he undersigned finds that the claimant has the maximum residual functional capacity to lift and carry no more than 10 pounds frequently and 20 pounds occasionally.  The claimant can sit, stand, or walk for up to six hours each in an eight-hour workday.  She can no more than occasionally climb ladders, ropes, and scaffolds.  She can no more than occasionally kneel and crawl.  She needs to avoid concentrated exposure to occupational hazards such as open moving machinery and unprotected heights.
>
> Social Security Ruling 96-6p states that findings of fact made by State agency medical consultants regarding the nature and severity of an individuals's impairment must be treated as expert opinion evidence of non-examining sources to be considered and weighed along with the medical evidence from other sources.  It is noted that the residual functional capacity determined by the undersigned is the same as that provided by State

agency non-examining medical consultants in Exhibit 5F.

> In making the finding of the claimant's residual functional capacity the undersigned considered the impact of the claimant's pain and other symptoms to the extent the undersigned found the claimant credible in her statements about her pain and other symptoms. The undersigned also considered all of the evidence as described throughout the decision. In particular, the undersigned considered the State agency non-examining consultant assessment, the objective medical evidence, the claimant's overall treatment history, and the objective medical evidence.

(Tr. 15-16).

Determination of residual functional capacity is a medical question and at least "some medical evidence 'must support the determination of the claimant's [residual functional capacity] and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace.'" Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001) (quoting Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001)). Further, determination of residual functional capacity is "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)).

The ALJ's residual functional capacity assessment is supported by the record as a whole, including the objective medical evidence. Notably, none of plaintiff's treating physicians imposed any functional limitations on plaintiff. The objective medical record is consistent with the ability to perform light work. The record is not supportive of any greater restriction due to plaintiff's impairments.

Plaintiff argues that the ALJ erred in relying on the opinion of the non-examining state agency medical consultant, who may not even be a physician. Although the ALJ noted that his finding was consistent with that of the state agency medical consultant, he did not rely solely on the

medical consultant's opinion. Rather, the ALJ stated that he had considered all the evidence of record, including the assessment of the state agency medical consultant, the objective medical evidence, and plaintiff's overall treatment history. (Tr. 16).

The ALJ's residual functional capacity is also consistent, in part, with plaintiff's own statements. Plaintiff reported to Dr. Bhattacharya that she could lift fifteen pounds, walk five blocks, and bend down. (Tr. 150). At the hearing, plaintiff testified that she could sit for a couple of hours before she had to change positions and that she had even less difficulty standing. (Tr. 232). Further, plaintiff testified that she stopped working at her last job because her position was eliminated, rather than due to her impairments. (Tr. 226).

### 4. Vocational Expert Testimony

Plaintiff argues that the ALJ erred in failing to properly consider the vocational expert's testimony. Defendant contends that the ALJ properly determined that plaintiff could return to her past relevant work and thus was not required to obtain vocational expert testimony.

As discussed above, throughout the disability determination process, the burden remains on the claimant until she adequately demonstrates an inability to perform her previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work as it exists in the national economy. See Beckley, 152 F.3d at 1059; 20 C.F.R. §§ 404.1520(f), 416.920(f).

The ALJ properly concluded that plaintiff could perform her past relevant work. The ALJ found that plaintiff had the residual functional capacity to perform light work. (Tr. 15). This formulation is supported by the medical evidence above, as discussed above. The ALJ then compared plaintiff's residual functional capacity with her past relevant work and found that plaintiff

could return to her past relevant work as a data technician/receptionist. (Tr. 16). No error is present in this determination by the ALJ.

Plaintiff claims that the ALJ erred in finding that she was capable of performing light work because the vocational expert testified that plaintiff would be unable to perform any jobs if she required a walker to ambulate. There is no evidence in the record, however, that plaintiff required a walker to ambulate. In fact, plaintiff testified that prior to undergoing surgery,[20] she did not use a walker, cane, or any other assistive device. (Tr. 228).

As explained above, the ALJ properly determined that plaintiff could return to her past relevant work. Thus, no vocational expert testimony was required. See Hogan v. Apfel, 239 F.3d 958, 962 (8th Cir. 2001) ("[u]nder the five-step analysis of social security cases, when a claimant can perform his past relevant work, he is not disabled. Once this decision is made ... the services of a vocational expert are not necessary.") (quoting Gaddis v. Chater, 76 F.3d 893, 895 (8th Cir. 1996)).

---

[20]Plaintiff's administrative hearing was held only fifteen days after she underwent spinal fusion surgery. (Tr. 222).

## Conclusion

Substantial evidence in the record as a whole supports the decision of the ALJ finding plaintiff not disabled because the evidence of record does not support the presence of a disabling impairment.  Accordingly, Judgment will be entered separately in favor of defendant in accordance with this Memorandum.

So Ordered this 6th   day of September, 2007.

_____
E. RICHARD WEBBER
UNITED STATES DISTRICT JUDGE